# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAISAL BIN ALI JABER, *et al.*, | * |
| | * |
|     Plaintiffs, | * |
| | * |
|     v. | * |
| | *   Civil Action No. 1:16-cv-00742 (KBJ) |
| DEPARTMENT OF DEFENSE, *et al.*, | * |
| | * |
|     Defendants. | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PLAINTIFFS' SUR-REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' <u>CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*

Date: May 30, 2017

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ...............................................................................................................1

ARGUMENT ......................................................................................................................1

I.      DEFENDANTS MUST SARCH FOR ALL RESPONSIVE RECORDS BEFORE
        ISSUING A PARTIAL *GLOMAR* RESPONSE.........................................................2

II.     DEFENDANTS' ARGUMENT DOES NOT SUPPORT THEIR *GLOMAR*
        RESPONSE...........................................................................................................10

III.    OTHER SEARCH ISSUES ....................................................................................14

CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

**Cases:**                                                                                      **Pages**

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ...................................................................10

*Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) .......................................10

*Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926 (D.C. Cir. 2012) ................................................3, 4, 5, 8

*Hayden v. NSA/CSS*, 608 F.2d 1381 (D.C. Cir. 1979) ...........................................................10

*Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262 (D.D.C. 2011) .........................................11

*Jefferson v. DOJ, Office of Prof'l Resp.*, 284 F.3d 172 (D.C. Cir. 2002) ..............................4

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987) ..........................................................................10

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) .......................................................3, 5

*Mead Data Ctr., Inc. v. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ..................8

*People for the Am. Way Found. v. NSA*, 462 F. Supp. 2d 21 (D.D.C. 2006) .........................4, 5

*Shapiro v. DOJ*, 153 F. Supp. 3d 253 (D.D.C. 2016) .............................................................8

*Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008) ..............8

*Wheeler v. CIA*, 271 F. Supp. 2d 132 (D.D.C. 2003) .............................................................3, 5

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ..........................................................................3, 4, 5

## INTRODUCTION

Plaintiffs Faisal bin Ali Jaber ("bin Ali Jaber") and Edward Pilkington brought this case against Defendants Department of Defense ("DOD"), Department of Justice ("DOJ"), Department of State ("State"), and Department of the Treasury ("Treasury") to obtain records under the Freedom of Information Act ("FOIA") pertaining to a drone strike in Khashamir, Yemen, and bin Ali Jaber's subsequent efforts to seek answers about the drone strike  (1st Am. Compl., Dkt. #15, ¶¶ 18, 32, 62, 81, 88, 101 (filed May 23, 2016).)  On 16 December 2016, Defendants filed a Motion for Summary Judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  On 4 April 2017, Plaintiffs filed their Opposition along with a Cross-Motion for Partial Summary Judgment.  On 1 May 2017, Defendants filed their Reply supporting their Motion and opposing Plaintiffs' Cross-Motion.  For the reasons stated in Plaintiffs' previous brief and herein, the Court should deny Defendants' Motion[1] and grant Plaintiffs' Cross-Motion for Partial Summary Judgment.

## ARGUMENT

Defendants' Reply suffers from two major infirmities: 1) Defendants argue against arguments Plaintiffs did not make and accordingly ignore the arguments Plaintiffs *did* make; and 2) when Defendants *do* address the correct controversy, they cite to authorities which do not support their position.

Defendants first miss the mark in their first paragraph, in which they advise the Court that "the only real issue that the Court must decide is the propriety of the Glomar response

---

[1] Because any argument beyond the scope of Plaintiffs' Cross-Motion is technically a Sur-Reply to Defendants' Motion, Plaintiffs are filing a motion for leave to file a sur-reply contemporaneously with this brief to cover arguments pertaining to matters beyond the three searches at issue in their Cross-Motion.

itself." (Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. & Opp'n Pls.' Cross-Mot. Part. Summ. J., Dkt. #35, at 1 (filed May 1, 2017) [hereinafter Defs.' Reply].) While Plaintiffs concede that Defendants' *Glomar* response is the more pervasive problem in this case, Defendants egregiously misconstrue the record when they allege that "Plaintiffs do not meaningfully challenge the adequacy of the searches conducted by Defendants . . . for responsive documents that do not implicate the Government's Glomar response." (*Id.*). It is here, in the second sentence of the first paragraph of their Introduction, that Defendants first attempt to recast the debate. Instead of an argument over whether or not Defendants demonstrated that there are no genuine issues of material fact over the scope of their *Glomar* response and the search for records outside that scope, Defendants ask the Court to adjudicate a fictitious argument over whether or not they conducted adequate searches for records which did not fall within the scope of their "unquestionably correct" (*id.*) *Glomar* response, without paying any mind to the fact that they have never actually stated what that scope *is*.

## I.   DEFENDANTS MUST SEARCH FOR ALL RESPONSIVE RECORDS BEFORE ISSUING A PARTIAL *GLOMAR* RESPONSE

The lack of a clearly articulated scope for the *Glomar* response is in fact the common thread which links together Plaintiffs' arguments. However, because of the way in which Defendants' processed these requests and argued their case, they have presented a much more fundamental question for the Court: did they have to conduct a search for responsive records before issuing their *Glomar* responses? Defendants argue that they did not, because they "could not cast a wider net without disclosing classified and statutorily protected information." (*Id.* at 4; *see also id.* at 5 ("Defendants were only required to conduct a reasonable search *for responsive records that do not implicate the Glomar response*." (emphasis added)).) Plaintiffs,

2

on the other hand, argue that this case is easily distinguishable from those which have held that agencies do not have to perform searches when making *Glomar* responses.

The D.C. Circuit considered this question in *Electronic Privacy Information Center v. NSA* ("*EPIC*"), surveying the relevant case law and holding that the Government was not required to conduct a search in that case before issuing a *Glomar* response. The Circuit's discussion in that case, specifically with how it contrasted with a previous case, is the best argument which could be made for Defendants' position,[2] while still serving to highlight how *this* case bears far more similarity to the previous case:

> EPIC argues that Section 552(b) requires NSA to search for responsive documents and conduct a segregability analysis prior to issuing a *Glomar* response. We rejected a similar argument in *Wolf*, and EPIC is no more persuasive. In *Wolf*, the requester claimed that *de novo* review of the agency's response "requires the district court to order the Agency to search for responsive records and to submit a *Vaughn* index." 473 F.3d at 374 n.4. The Court disagreed, explaining that the requester's argument "misunderstands the nature of a *Glomar* response, which narrows the FOIA issue to the existence of records *vel non*." When the agency takes the position that it can neither confirm nor deny the existence of the requested records, "there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Id.*; *see also Wheeler v. CIA*, 271 F. Supp. 2d 132, 141 (D.D.C. 2003) (affirming a Glomar response when the agency did not identify "whether or to what extent it had conducted a search"). The same logic applies here. Because we find the Janosek Declaration sufficient to support NSA's *Glomar* response, requiring NSA to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise.

> EPIC claims this Court has upheld *Glomar* responses "only in cases where it is apparent from the record that the Agency first conducted a search and segregability analysis, and even disclosed or withheld specific responsive records," Appellant's Br. 25. This is inaccurate. In the cases cited by EPIC, the agency conducted a search and segregability analysis of its own volition prior to issuing the *Glomar* response. *See, e.g.*, *Larson*, 565 F.3d at 861-62. In none of these cases, however, did the Court hold—or even imply—that such a search and

---

[2] Unfortunately, Defendants did not bother to defend their position that they did not have to conduct full searches before issuing *Glomar* responses, leaving it to Plaintiffs and the Court to guess what arguments they might have made.

analysis is *required*. *See People for the Am. Way Found. v. NSA*, 462 F. Supp. 2d 21, 30 n.5 (D.D.C. 2006) ("[A] *Vaughn* index is not required here, where it could cause the very harm that section 6 was intended to prevent."). Likewise, EPIC's assertion that "[a]gencies are not exempt from performing a segregability analysis, even in cases where they assert a *Glomar* response," Appellant's Br. 24, is also incorrect. Although EPIC cites *Wolf* in support of its proposition, that case expressly rejected EPIC's argument in a footnote. *See Wolf*, 473 F.3d at 374 n.4.

EPIC's reliance on *Jefferson v. Dep't of Justice, Office of Prof'l Resp.*, 284 F.3d 172, 350 U.S. App. D.C. 337 (D.C. Cir. 2002), is also misplaced. In *Jefferson*, the Court held that the Office of Professional Responsibility ("OPR") was not entitled to make a *Glomar* response as to all of its files in the absence of an evidentiary showing to support that response. *Id.* at 179. But that case turned on two factors not present here: (1) it applied Exemption 7(C), which protects only "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7); and (2) not all records of the OPR are necessarily law enforcement records. *Jefferson*, 284 F.3d at 178-79. Because the request asked for "all records" pertaining to a particular AUSA, and not simply those compiled for law enforcement purposes, the Court held that *Glomar* response was inappropriate in light of OPR's failure to show that all of the responsive records were covered by the Exemption, *i.e.*, were compiled for law enforcement purposes. *Id.* at 179. Here, by contrast, it is apparent that any response to EPIC's FOIA request might reveal whether NSA did or did not consider a particular cybersecurity incident, or the security settings in particular commercial technologies, to be a potential threat to U.S. Government information systems. Any such threat assessment, as well as any ensuing action or inaction, implicates an undisputed NSA "function"—its Information Assurance mission—and thus falls within the broad ambit of Section 6 of the National Security Agency Act.

*Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 934-35 (D.C. Cir. 2012) (emphasis in original) [hereinafter *EPIC*].

In order to see how this case more closely resembles *Jefferson* than *EPIC*, it is first necessary to explore the single fact which *EPIC*, *Wolf*, and *Wheeler* share, which led the courts to hold that the agencies were not required to perform any searches before issuing a *Glomar* response. In all three cases, the Government issued a *full Glomar*, in which it stated that the fact of the existence or nonexistence of *any* records responsive to *any* part of the requests was protected under an exemption. *See id.* at 930 (agency neither confirmed nor denied existence of

any responsive records); *Wolf v. CIA*, 473 F.3d 370, 373 (D.C. Cir. 2007) (same); *Wheeler*, 271

F. Supp. 2d at 134-35 (same). The Government made this point clearly and concisely in its brief

in *EPIC*:

> [I]t may be apparent from the face of a FOIA request that the existence or
> nonexistence of any responsive records falls within the scope of the relevant
> [exemption]. . . . Moreover, when it is apparent from the face of a FOIA request
> that disclosure confirming or denying the existence of any responsive records is
> not required because of an expansive [exemption], conducting a search before
> issuing a *Glomar* response would be a meaningless (and costly) exercise. That is
> precisely the circumstance presented by this case. As explained above, it is plain
> from the face of plaintiff's FOIA request that to confirm or deny the existence of
> responsive records would disclose information protected by [an exemption].

Br. for Appellee, Dkt. #1354907, at 27 (filed Jan. 26, 2012), *EPIC*, attached as Ex. C.

In contrast, the two cases cited by the Circuit for the proposition that the agencies which

performed searches before issuing a *Glomar* response did so voluntarily were cases in which the

agencies issued *partial Glomar* responses, in which they searched for records responsive to some

parts of the requests but refused to confirm or deny the existence or nonexistence of records

responsive to other parts. *See Larson v. Dep't of State*, 565 F.3d 857, 861-62 (D.C. Cir. 2009)

(agency issued *Glomar* response to one requester, while processing other similar requests);

*People for the Am. Way Found.*, 462 F. Supp. 2d at 26 (agency issued *Glomar* response for one

part of multi-part request, while processing three other parts).

The importance of this distinction can be easily seen in the fact pattern of the final cited

case—*Jefferson v. DOJ/OPR*—in which the agency issued a *full Glomar* response and the Court

held that it could not do so because it had not proven that all of the records covered by the

*Glomar* response were actually legitimately withheld. *EPIC*, 678 F.3d at 934. The common

thread running through all of these cases is that, just like with any other exemption claims, an

agency can only issue a *Glomar* response when the information it seeks to withhold is *actually*

*exempt*.  If an agency demonstrates that *any* responsive information it could possibly find would be exempt, it does not have to perform a pointless search (*EPIC*, *Wolf*, *Wheeler*).  If an agency *tries* to demonstrate this but there is a genuine issue of material fact as to whether *all* responsive information would be properly covered, it *cannot* issue a full *Glomar* response (*Jefferson*).  Accordingly, if an agency knows that it cannot justify a full *Glomar* response but believes it can justify a partial *Glomar* response, it *must* issue the partial *Glomar* response and explain why all the categories of responsive records covered by the *Glomar* response are properly covered.  *EPIC* does not contradict this conclusion, notwithstanding its statement, "In none of these cases, however, did the Court hold—or even imply—that such a search and analysis is *required*," *EPIC*, 678 F.3d at 934, for two simple reasons: 1) the partial *Glomar* cases did not present the question of whether a search was required because the agencies had already performed them; and 2) even if searches *were* required in the partial *Glomar* cases, a search would not have been required in *EPIC* because that case involved a *full Glomar* response.  Therefore, while *EPIC* did correctly state that the court did not hold or imply that a search was required before a partial *Glomar* response could be issued, that only speaks to the fact that the question was never properly in controversy before, and this Court should find that a genuine issue of material fact exists regarding the legitimacy of the scope of Defendants' partial *Glomar* response.

Simply put, in their Reply, Defendants admitted a critical fact that places this case squarely in the same category as *Jefferson*.  Despite previously arguing that they performed searches for all responsive records which would not implicate their partial *Glomar* responses, they walked this assertion back after Plaintiffs challenged the scope of their searches.  Now Defendants *qualify* their reason for only conducting partial searches, and those qualifications are fatal to their argument.  After arguing that Defendants were only required to conduct a

reasonable search for responsive records that do not implicate their partial *Glomar* responses in response to Plaintiffs' arguments showing that other records exist which would not be properly covered, they state tellingly, "And, in any event, the records Plaintiffs hypothesize exist would *likely* be encompassed by the Glomar response." (Defs.' Reply at 5 (emphasis added).) Defendants then qualify their argument again, concluding, "In sum, Defendants tailored a reasonable search to identify only those records that would not implicate the Glomar response, and it would be illogical for Defendants to cast a wider net for documents that would *potentially* reveal classified and statutorily protected information." (*Id.* (emphasis added).) In other words, Defendants admit that if they searched for records responsive to *all* of Plaintiffs' request, any records they had not already searched for would only be *likely to* be properly covered by the *Glomar* response because they would only *potentially* reveal protected information.

This is a very significant distinction. Information which is likely to be exempt may not be exempt, and information which would potentially reveal exempt information may not reveal exempt information. This is analogous to a case recently decided by Judge Moss in which the Federal Bureau of Investigation ("FBI") attempted to withhold *all* records of a particular type because *some* of them would be properly exempt, which he held to violate FOIA, citing *EPIC*:

> This principle operates as an important limitation on the use of the *Glomar* response: it is proper for an agency to refuse to confirm or deny the existence of records only "if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents." In none of the *Glomar* cases, however, has the D.C. Circuit permitted an agency to withhold—or to decline to confirm or to deny the existence of—any record or information that is *not* itself protected by a FOIA exemption or exclusion. When the *Glomar* doctrine is properly invoked, one of two things holds true: either a protected record exists or no record exists. Either way, the requester is not denied access to any *unprotected* records. Indeed, to the Court's knowledge, the doctrine has never been used to preclude the production or disclosure of concededly *unprotected* records.

*Shapiro v. DOJ*, 153 F. Supp. 3d 253, 274 (D.D.C. 2016) (citation omitted) (emphasis in original) (citing *EPIC* at 931). Much like that case, and *Jefferson* before it, this case involves a scenario in which an agency is failing to release information without showing that it is covered by an exemption, which FOIA does not allow. In *Shapiro*, the agency improperly utilized a categorical withholding which covered both exempt and nonexempt records. In *Jefferson*, the agency issued a full *Glomar* response without demonstrating that all records responsive to the request would actually be properly covered by the *Glomar* response. In this case, the agencies only searched for records which were sure to be covered by the partial *Glomar* response and in doing so did not locate records which might *not* be covered by it. Just like "an agency cannot justify withholding an entire document simply by showing that it contains some exempt material," *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting *Mead Data Ctr., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)), an agency cannot justify refusing to *search an entire system* simply by showing that it contains some exempt material.

For this reason, this case presents the fact pattern which was missing from *EPIC* or any of the cases it cited. Even assuming *arguendo* that Defendants can properly refuse to confirm or deny the existence or nonexistence of *some* records (which Plaintiffs do not), there are only two ways in which Defendants could demonstrate that there are no genuine issues of material fact regarding their assertion that they performed adequate searches for responsive non-exempt records. First, they could conduct a full search for all records responsive to all parts of Plaintiffs' requests, identify the records which would be properly covered by the partial *Glomar* response, and then refuse to confirm or deny the existence or nonexistence of *those records*, while still processing the other records they found and either releasing or withholding them. A

8

declaration describing such a search would read something like, "The agency conducted a search for records responsive to Plaintiffs' request. It identified 100 records which would not tend to confirm or deny whether the U.S. Government conducted the purported drone strike and processed them under FOIA. It can neither confirm nor deny the existence or nonexistence of any other records which would tend to confirm or deny whether the U.S. Government conducted the purported drone strike." Notably, this is different than what happened in the instant case because the agency first identified records which would allegedly be properly covered by a partial *Glomar* response after searching for *all* records, instead of the agency only searching for *some* records because searching other places would identify records which *might* be properly covered by a partial *Glomar* response. Moreover, the only reason that Defendants give for *not* doing this—that they "could not cast a wider net without disclosing classified and statutorily protected information" (Defs.' Reply at 4), is entirely frivolous, since they would still be able to issue a partial *Glomar* response for any records properly covered by it without disclosing any "classified and statutorily protected information."

Defendants' second legitimate option is similar in nature but more demanding than what occurred here. They could offer declarations stating that searching any other locations or systems would be futile because *any* responsive records located in those systems *would be* covered by the partial *Glomar* response. The operating terms are "*any*" and "*would be*," which stand in stark contrast to "would *likely* be" and "*potentially*." (*Id.* at 5 (emphasis added).)

Neither of these options requires Defendants to provide the Court with classified information, and no amount of classified information can replace either of these options, so Plaintiffs respectfully discourage the Court from accepting Defendants' offer "to provide a classified declaration *ex parte*, *in camera*" (*id.* at 3 n.1) and instead deny summary judgment to

Defendants until they demonstrate that they have satisfied one of these two options (which would accordingly correlate to a finding that Plaintiffs *did* meet the requirements for partial summary judgment on their Cross-Motion. Similarly, contrary to Defendants' citation to inapposite case law, there is no reason for the Court to afford any degree of deference to Defendants' unadorned conclusions on this issue because the question is not whether or not information properly falls under a national security exemption (*id.* at 4 (quoting *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003))), but whether the agencies conducted a reasonable search to locate and identify records which did *not*. Even if the Court *were* to afford deference on this question, it is well-established that "deference is not equivalent to acquiescence," *Campbell v. DOJ*, 164 F.3d 20, 31 (D.C. Cir. 1998) (quoting *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987)), and in this case, Defendants' claims about the scope of their partial *Glomar* responses are far "too vague or sweeping" to pass muster. *Hayden v. NSA/CSS*, 608 F.2d 1381, 1387 (D.C. Cir. 1979).

## II. DEFENDANTS' ARGUMENT DOES NOT SUPPORT THEIR *GLOMAR* RESPONSE

Simply put, this is not a case where an agency argues that an exemption is met for certain reasons, and the requester argues that it is not met for other reasons, no matter how much Defendants attempt to recast this as a situation where "Plaintiffs' bald conjecture cannot supplant a conclusion reached by an original classification authority." (Defs.' Reply at 6.) As noted above, an agency must plausibly connect an exemption claim to a risk of harm, and it cannot do so through merely conclusory claims, and it *definitely* cannot do so by making an argument which, taken with as much deference as the Court can give, simply *does not make sense*. Despite this basic rule, Defendants are seeking to do exactly that, offering arguments that,

given as much substantial weight as the Court may afford, still do not plausibly explain how the information is properly exempt.

The most striking example of this absence of evidence is the bald statement, "Plaintiffs simply ignore the reality that the Government's acknowledgement that it did not participate in a given operation would signal to other nations that the United States is willing to comment on its foreign liaison relationships." (*Id.* at 6-7.) This sentence is the product of a logical fallacy. The fact that the United States is willing to acknowledge when it did *not* do something has absolutely no bearing on whether or not it would acknowledge when it *did*. In fact, the only reason that Defendants' even *make* this argument is because they have no other response to the legitimate criticism that, when an agency argues that the fact of the existence *or nonexistence* of information is an exempt fact, it cannot only provide evidence of how the fact of the *existence* of that information is exempt. If an agency argues that the fact of the existence or nonexistence of a particular record—for instance, an intelligence file—is itself a classified fact, it must prove two things: 1) the fact that the file exists will cause harm to national security if true; *and* 2) the fact that the file *does not exist* will cause harm to national security if true. For an example of a case where the agency properly met this standard test, one need only consider *International Counsel Bureau v. CIA*, in which the court summarized how the agency satisfied both parts of the test, with appropriate emphasis: "The Agency detailed the harms that could result from *confirming* that it kept records for these detainees. . . . The CIA then described the harms that could result from *denying* the existence of records relating to these detainees." 774 F. Supp. 2d 262, 269-70 (D.D.C. 2011) (emphasis in original). In contrast, in this case not one but *four*

*declarants* each purportedly independently[3] reached the exact same conclusion that revealing the *existence* of certain records would cause harm to the national security, while none of them plausibly explained how revealing the *nonexistence* of those records would do the same. Until Defendants can plausibly explain how revealing that the United States did not have a role in this drone strike would have *any* effect on its relationships with its foreign partners, it has only provided half of the necessary evidence and some logically unsound conclusory statements, and there remains a genuine issue of material fact.

While Defendants correctly recognize the preceding argument but only respond to half of it, their response to the next related argument bears no resemblance to the actual argument Plaintiffs are making, and no amount of citation to unrelated case law can serve to refute the basic point Plaintiffs made. Plaintiffs explicitly stated that they were not making the argument

---

[3] With respect to Defendants' attempt to recast the testimony of their declarants, the fact that "each original classification authority declared under penalty of perjury that the statements in their respective declarations were truthful and accurate to the best of their knowledge" (Defs.' Reply at 6 n.2) only exacerbates the fact that at least some of these statements were by necessity false, since each declarant except Ms. Brinkmann declared under penalty of perjury that he/she determined as an original classification authority that this fact must be properly classified for the exact same reasons, when the actual practice is for one agency—the agency holding the primary equities, in this case probably DOD—to originally classify the information and for all other agencies to *derivatively* classify it pursuant to Exec. Order 13,586, Part 2. In fact, if Ms. Brinkmann had stated that she did this, there would not be such a problem with *her* testimony. Instead, not only do Defendants argue that four separate Original Classification Authorities each made identical original classification determinations under Exec. Order 13,586, Part 1, in violation of established procedures, but they argue that one of them even declared under penalty of perjury that "[agency]" properly classified the information (Lewis Decl., Dkt. #23-4, ¶ 16 (filed Dec. 16, 2016) (bracketed text in original)), and another purportedly "made an independent determination that Treasury had to assert the Glomar response" (Defs.' Reply at 8) only after being *told to*. The record is clear that this is a case where a government attorney told Original Classification Authorities what determination they were supposed to "make" and they obediently acted accordingly and declared that they had reached the conclusion on their own, which should give the Court significant pause, if for no other reason than to question how Treasury would have responded if it had been the only agency to receive Plaintiffs' FOIA request and it had no contact with the other Defendants.

that the Government had officially disclosed the fact of its involvement *vel non* in the drone

strike (Pls.' Mem. P. & A. Opp'n Defs.' Mot. Summ. J. & Supp. Pls.' Cross-Mot. Part. Summ. J.,

Dkt. #32, at 16 (filed Apr. 4, 2017) ("While it is debatable whether a foreign government can

officially disclose U.S. Government information for the purposes of a FOIA waiver, the Court

does not have to reach that question, because that is not the argument Plaintiffs are making.")),

and yet Defendants spend their entire discussion of the issue on the prior official disclosure

doctrine which Plaintiffs stated they *were not invoking*.  (Defs.' Reply at 7-8.)  Plaintiffs never

argued that the actions of the Yemeni government constituted an official disclosure by the

United States which would trigger this doctrine.  Plaintiffs' argument instead spoke solely to the

question of harm, and whether Defendants' arguments about the harm of revealing a role in the

drone strike was plausible or logical.  Simply put, it is a staple of FOIA jurisprudence—and, in

fact, civil litigation writ large—that a person or entity cannot be harmed by the release of

information that that person or entity has already released.  A person cannot be harmed by an

official acknowledgement that he was investigated by FBI if he has already publicly admitted as

much.  An attorney cannot withhold information about a client under a claim of privilege if the

client has already publicly shared it.  A law enforcement agency cannot withhold information

about an alleged confidential source if the source does not have an expectation of

confidentiality.  Official acknowledgement of the fact that Yemen cooperated with the United

States on a drone strike will not jeopardize the United States-Yemen partnership if Yemen has

already publicly acknowledged the cooperation.  Since Defendants' primary argument for why

the fact of whether or not the Government played a role in the drone strike must be kept secret is

that it would jeopardize its relationship with Yemen if it were revealed, the fact that Yemen has

openly admitted the fact and does not have an expectation of confidentiality raises a genuine

13

issue of material fact regarding the conclusory and implausible assertions made in support of Defendants' *Glomar* responses.

**III.    OTHER SEARCH ISSUES**

Defendants' attempt to refute two of Plaintiffs' specific challenges to the adequacy of their searches similarly mischaracterize the record and need only be discussed briefly.

First, in an attempt to rehabilitate the Mason Declaration and demonstrate that Treasury conducted an adequate search, Defendants misstate what Mr. Mason actually testified to, raising a problematic question of his candor.  As the Court may recall, Mr. Mason testified that initially "personnel electronically searched all records systems that they reasonably expected might contain the information sought by the plaintiffs, searching for responsive emails and electronic records at all classification levels."  (Mason Decl., Dkt. #23-8, ¶ 4 (filed Dec. 16, 2016).)  In other words, Treasury conducted a search for *all* records responsive to *all* of Plaintiffs' request. (*Id.* ¶ 5 ("Treasury did not originally believe that it needed to assert a Glomar response because it mistakenly believed that no offices within the Department would possess records responsive to any of the categories of documents sought by Plaintiffs in their FOIA request.").)  However, in their Reply, Defendants paint a different picture of Treasury's initial search: "Treasury mistakenly believed that it initially conducted an adequate search for responsive records, *the existence or non-existence of which would not tend to reveal classified or statutorily-protected information*."  (Defs.' Reply at 10 (emphasis added).)  This statement asserts that Treasury conducted only a search for records that it determined would not be implicated by the partial *Glomar* response, as the other agencies did, instead of conducting a full search, as Mr. Mason testified.  These two statements cannot be reconciled, and that should trouble the Court.  If the Mason Declaration is the accurate representation of Treasury's search, then Defendants

14

attempted to misrepresent that testimony to the Court, but if the Reply is the accurate representation, then Mr. Mason provided false testimony. Either way, the Court should order Defendants to explain the discrepancy.

Second, in an attempt to explain why State did not locate a record clearly referenced in one of the released records, Defendants again twist the record in two ways. First, they argue that the email in question "actually indicates that no additional records exist" because the author states that he did not "recall receiving any more information" (Defs.' Reply at 11) even though the "more" in "more information" is in addition to the actual high-side email Plaintiffs are arguing should have been located. Then, Defendants conclude that "State confirmed that the attorneys within the Office of Political-Military Affairs reasonably likely to possess responsive records that do not implicate the Glomar response conducted reasonable searches of their classified *and* unclassified email systems" (*id.* at 12), which, even if true, does not allege that the sender of that email, Steven Fabry, *was* one of these "attorneys within the Office of Political-Military Affairs," and if he was not, why a search of *other* employees' classified email systems was adequate to find an email clearly located on *his* classified email system.

<h2 style="text-align:center;">CONCLUSION</h2>

For the foregoing reasons and those stated in Plaintiffs' previous brief, the Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Partial Summary Judgment.

Date:   May 30, 2017

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*

16

[ORAL ARGUMENT SCHEDULED FOR MARCH 20, 2012]

No. 11-5233

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ELECTRONIC PRIVACY INFORMATION CENTER,

Plaintiff-Appellant,

v.

NATIONAL SECURITY AGENCY,

Defendant-Appellee.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

BRIEF FOR APPELLEE
_____

TONY WEST
  *Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

DOUGLAS N. LETTER
  (202) 514-3602
CATHERINE Y. HANCOCK
  (202) 514-3469
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *Department of Justice*
  *Washington, D.C.  20530-0001*

_____
_____

Ex. C

**B.**  Because plaintiff assumes there may be non-exempt records covered by its FOIA request, EPIC asserts that NSA was required to conduct a search for responsive records.  *See* Br. at 10 (without a search, "not even the agency can know whether there is a factual basis for its legal position"); *accord id.* at 20-22.  Plaintiff further contends that because NSA failed to conduct a search, it also failed to perform the requisite segregability analysis, *see* 5 U.S.C. § 552(b), to determine whether there was any non-exempt information that could be disclosed.  Plaintiff's arguments demonstrate a fundamental misunderstanding of the purpose and consequences of a *Glomar* response.

When an agency issues a *Glomar* response, "the adequacy of the search is irrelevant * * * because the issue is whether the Agency has given sufficiently detailed and persuasive reasons for taking the position that it will neither confirm nor deny the existence or non-existence of any responsive records."  *Wheeler* v. *CIA*, 271 F. Supp. 2d 132, 141-42 (D.D.C. 2003) (affirming a *Glomar* response when the agency "did not identify whether or to what extent it had conducted a search"); *see also Wolf*, 473 F.3d at 374 n.4 (rejecting plaintiff's argument that, to review the propriety of a *Glomar* response, the court must order the agency to search for responsive records).  Indeed, particularly when a *Glomar* response is issued pursuant to Exemption 3, an agency may have no need to conduct a search.  That is because

26

Exemption 3's "applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Ass'n of Retired R.R. Workers*, 830 F.2d at 336.

In other words, it may be apparent from the face of a FOIA request that the existence or nonexistence of any responsive records falls within the scope of the relevant protective statute. Indeed, plaintiff concedes as much. Br. at 22 ("There may be times when a requested category of documents falls unquestionably within the gambit of a FOIA exemption."). That is particularly likely to be true when the applicable protective statute is as broad as Section 6. Moreover, when it is apparent from the face of a FOIA request that disclosure confirming or denying the existence of any responsive records is not required because of an expansive protective statute, conducting a search before issuing a *Glomar* response would be a meaningless (and costly) exercise.

That is precisely the circumstance presented by this case. As explained above, it is plain from the face of plaintiff's FOIA request that to confirm or deny the existence of responsive records would disclose information protected by Section 6. Specifically, NSA determined that responding to plaintiff's request might reveal whether NSA did or did not consider a particular cybersecurity incident, or security

27

settings in certain commercial technologies, to potentially expose U.S. government information systems to an external threat. JA 52-53. That threat assessment and any ensuing action or inaction would go to the heart of a major NSA function, its Information Assurance mission. JA 52-53. That well-supported determination alone fulfills NSA's obligation with respect to plaintiff's request. *Hayden*, 608 F.2d at 1390 ("[T]he Agency stated in its affidavit[] that all requested documents concerned a specific NSA activity * * * . This is all that is necessary for the Agency to meet its burden under Public Law No. 86-36 and Exemption 3.").

Plaintiff's reliance (Br. at 15-17, 22) on *Founding Church of Scientology* to suggest that NSA's affidavit is insufficient to supports its *Glomar* response is misplaced. This Court rejected the affidavit in that case as "far too conclusory" because the affidavit "furnishe[d] precious little that would enable a determination as to whether the materials withheld actually do bear on the agency's organization, functions or faculty for intelligence operations." 610 F.2d at 831; *id.* (the affidavit "merely states, without any elucidation whatever, that compliance with appellant's demand would reveal 'certain functions and activities * * * protected from mandatory disclosure by Section 6,' and would 'jeopardize national security functions the agency was established to perform.'") (citation omitted). In other words, the affidavit failed to describe "[h]ow agency functions might be unveiled," or which functions "might

28

be revealed." *Id.* In stark contrast, NSA's affidavit here expressly states which functions and activities would be implicated by disclosure, and how acknowledging the existence or non-existence of requested records would reveal those functions or activities.

EPIC incorrectly argues (Br. at 11, 25) that a search is also necessary to provide this Court with a record to review. But the Janosek Declaration, which explains why the records requested are exempt under Exemption 3 and Section 6, is the applicable record for this Court to review. *See Larson*, 565 F.3d at 869-70 (where the agency meets its burden by affidavit, and plaintiff points to no evidence of bad faith, there is no need for further record review); *Wolf*, 473 F.3d at 374 n.4 ("'When the agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the agency's refusal.'").

Plaintiff also contends (Br. at 22-26) that NSA's failure to conduct a search precluded it from making a segregability analysis, thereby invalidating the NSA's *Glomar* response. Plaintiff is mistaken. The Janosek Declaration expressly states that "acknowledgment of the existence or nonexistence of even one record or communication satisfying Plaintiff's request would improperly disclose a function or activity of NSA and could have negative effects on NSA's Information Assurance

29

mission." JA 53. Accordingly, NSA concluded that "there is no reasonably segregable, nonexempt portion of the requested records that can be released." *Id.* NSA, therefore, is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material. *Sussman* v. *U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

In any event, a segregability analysis is required only when there are records, or portions of records, that are non-exempt. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). Where the NSA has already concluded that acknowledging the existence or non-existence of even one record would disclose information that is exempt, then *a fortiorari* there is no non-exempt information requiring a segregability analysis. *Cf. Wolf*, 473 F.3d at 374 n.4 (when agency invokes *Glomar* response, the only relevant documents for the court to review are the agency's affidavits).

**C.** Finally, plaintiff suggests that, because some information about NSA's Information Assurance mission is publicly available, NSA cannot legally refuse to confirm or deny the existence of records relating to that mission. *See* Br. at 18-19 (noting that "collaboration [between NSA and Google] was widely reported in the national media and acknowledged by the former director of the NSA"). Plaintiff's

30