# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| FAISAL BIN ALI JABER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF DEFENSE, *et al.*, <br><br> Defendants. |

Case No. 1:16-cv-00742 (TNM)

## MEMORANDUM OPINION

At issue in this case are Freedom of Information Act requests for information related to a 2012 drone strike in Yemen. Plaintiffs Faisal Bin Ali Jaber, a citizen of Yemen, and Edward Pilkington, a member of the news media, submitted the requests at issue in this case to various components of the Department of Defense, the Department of Justice, the Department of State, and the Department of the Treasury. Before this court are the Defendants' motion for summary judgment and the Plaintiffs' cross-motion for partial summary judgment. Because each Defendant has sufficiently demonstrated the appropriateness of its *Glomar* response and the adequacy of its search for responsive records not implicated by that response, the Defendants' motion for summary judgment will be granted and the Plaintiffs' cross-motion for partial summary judgment will be denied.

## I. BACKGROUND

According to Plaintiffs' amended complaint, the Defendants possess or control records pertaining to a drone strike carried out on August 29, 2012, in or near the Yemeni village of Khashamir. Am. Compl. at ¶¶ 5, 7, 9-11. The attack allegedly killed three men whose identities

are unknown but who, according to sources not clearly identified in the amended complaint, were members of al-Qaeda. *Id.* at ¶ 12. In addition, the amended complaint alleges that the attack killed Salem and Waleed bin Ali Jaber, civilians who had spoken out against Al-Qaeda. *Id.*

The Plaintiffs submitted six FOIA requests to the Defendants between February 9 and February 12, 2016. *Id.* at ¶¶ 18, 32, 62, 81, 88, 101. The request to the Office of the Secretary of Defense and Joint Staff ("OSD/JS")[1] included twelve categories of records:

1. Any and all records, including emails, pertaining to the 29 August 2012 drone strike ("the strike") or the people killed by it;
2. Any and all records, including emails, pertaining to legal opinions or memoranda referring to the strike or the people killed by it;
3. Any and all records, including emails, pertaining to any subsequent investigations (whether by the Executive Branch, Congress, or a foreign government) into the strike;
4. Any and all records, including emails, describing the reason the three unknown men were targeted for attack;
5. Any and all correspondence, including emails and records documenting oral or telephonic conversations, involving Department of Defense ("DOD") officials and the governments of Yemen and/or Germany (including courts) pertaining to the strike or the people killed by it;
6. Any and all records, including emails, pertaining to Congressional interest in the strike or the people killed by it;
7. Any and all records, including emails, pertaining to Mr. bin Ali Jaber's litigation in Germany regarding Ramstein Air Base and/or the case Bin Ali Jaber v. United States;
8. Any and all records, including emails, pertaining to the actual or potential disbursement or allocation of funds to Yemen for purposes of making compensation payments to Mr. bin Ali Jaber and/or his family;
9. Any and all records, including emails, pertaining to the compensation payments made by the government of Yemen to Mr. bin Ali Jaber and/or his family;
10. Any and all records, including emails, pertaining to Mr. bin Ali Jaber's visit to the United States and the meetings he had while here;
11. Any and all records, including emails, pertaining to Mr. bin Ali Jaber or the people killed by the strike (searching by individual names) which are not described above[;] and

---

[1] The OSD/JS is a component of the Department of Defense ("DOD"), which is a party to this case.

> 12. Any and all records identified or referenced in records responsive to Items
> 1-11 above which are not otherwise independently responsive to those Items.

*Id.* at ¶ 18. The requests submitted to the FOIA Coordinator at Ramstein Air Base, the Department of State ("State"), the Office of Information Policy ("OIP"), the Federal Bureau of Intelligence ("FBI"), and the Department of the Treasury ("Treasury") were "functionally equivalent . . . , with agency-specific modifications."[2] *Id.* at ¶¶ 32, 62, 81, 88, 101.

The amended complaint alleges that the Air Force and Treasury informed Plaintiffs that no responsive documents could be found. *Id.* at ¶¶ 37, 44, 49. The OSD/JS, State, the OIP, and the FBI acknowledged the FOIA requests but did not provide final responses. *Id.* at ¶¶ 22, 64, 83, 91; Answer at ¶ 16. On April 20, 2016, after the time to respond had elapsed and Plaintiffs had exhausted their administrative remedies, Plaintiffs filed a fifteen-count complaint. *See* Compl. at ¶¶ 26, 39, 55, 74, 84, 93, 102. Plaintiffs filed an amended complaint on May 23, 2016, also containing fifteen counts. The complaint alleged records denial by the Air Force and Treasury; constructive records denial by the OSD/JS, State, the OIP, and the FBI; denial of expedited processing by the OSD/JS, State, the FBI, and Treasury; constructive denial of expedited processing by the Air Force; failure to refer by DOD; denial of news media designation by State and Treasury; and denial of a public interest fee waiver by State.

At a hearing on June 6, 2016, the Defendants indicated their intention to provide a *Glomar* response covering certain aspects of Plaintiffs' FOIA requests and to process and produce any responsive documents not covered by the *Glomar* response. Tr. of Proceedings, pages 66, 97-98. On July 29, 2016, Defendants provided the following joint *Glomar* response:

> Defendants cannot confirm or deny the existence of any records that would tend
> to confirm one way or the other any U.S. government role in an alleged "29

---

[2] The OIP and FBI are components of the Department of Justice ("DOJ"), which is a party to this case. The Air Force is a component of DOD, which is also a party to this case.

3

> August 2012 drone strike." However, the Government will conduct searches for
> responsive records that would not tend to confirm one way or the other any U.S.
> government role in an alleged "29 August 2012 drone strike," such as documents
> pertaining to Mr. Jaber's litigation in Germany and the United States, as well as
> Mr. Jaber's visit to the United States.

Memo. ISO Mot. Dismiss at 6. OIP identified 140 pages of responsive records not covered by the *Glomar* response, produced 107 pages in part, and withheld 33 pages in full. *Id.* State identified 43 responsive documents not covered by the *Glomar* response, produced 41 documents in full or in part, and withheld 2 documents in full. *Id.* DOD identified 1,197 pages of responsive records not covered by the *Glomar* response and produced 1,072 pages of non-exempt materials. *Id.*

After issuing their *Glomar* response and making these productions, Defendants filed a motion for summary judgment, arguing that they had satisfied their FOIA obligations by issuing a partial *Glomar* response, conducting reasonable searches for responsive records not covered by the *Glomar* response, and producing the non-exempt documents identified by their searches. Plaintiffs opposed, challenging the scope and justification of the *Glomar* response and the adequacy of the Defendants' searches. They also filed a cross-motion for partial summary judgment, arguing that there is no genuine dispute of material fact as to the inadequacy of the searches conducted by the Air Force, Treasury, and State. These motions are now before me.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365-66 (D.C.

Cir. 2008); *see also* 5 U.S.C. § 552(a)(3)(A) (records sought must be "reasonably describe[d]"). Thus, a FOIA defendant is entitled to summary judgment if it demonstrates that there is no genuine dispute as to whether "each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). The "vast majority" of FOIA cases are decided on motions for summary judgment. *See Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

To show that unproduced documents are exempt from FOIA, an agency may file "affidavits describing the material withheld and the manner in which it falls within the exemption claimed." *King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987). Although courts review the applicability of FOIA exemptions *de novo*, they give "substantial weight to detailed agency explanations" of national security concerns related to the release of information. *Id.* "[I]f the fact of the existence or nonexistence of agency records falls within a FOIA exemption," a defendant may issue a *Glomar* response, declining to confirm or deny the existence of requested records. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *see also Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976) (allowing CIA to refuse to confirm or deny the existence of records related to any interest it had in the activities of the *Hughes Glomar Explorer* when the agency determined doing so would implicate the National Security Act's protection of information pertaining to intelligence sources and methods). An agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may attempt to do by affidavit.

*James Madison Project v. Dep't of Justice*, 208 F. Supp. 3d 265, 283 (D.D.C. 2016) (citing *Phillippi*, 546 F.2d at 1013).

To show that unproduced documents cannot be identified, a defendant must demonstrate "a good faith effort to [] search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In other words, the defendant must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). However, the touchstone of the analysis is the reasonableness of the search, not the records produced. *See Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) ("[T]he adequacy of a search is determined not by the fruits of the search, but by the appropriateness of [its] methods."); *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) ("[A] search, under FOIA, is not unreasonable simply because it fails to produce all relevant material.").

An agency has discretion to craft its search to meet this standard, and does not have to search every system if additional searches are unlikely to produce any marginal return. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). Searching for records requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. Dep't of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003). To demonstrate the reasonableness of its search, an agency can submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. Agency declarations are given "a presumption of good faith, which cannot be

rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

### III. ANALYSIS

#### A. The *Glomar* Response Was Appropriate

As stated above, Defendants' *Glomar* response asserts, "Defendants cannot confirm or deny the existence of any records that would tend to confirm one way or the other any U.S. government role in an alleged '29 August 2012 drone strike.'" Memo. ISO Mot. Dismiss at 6. In support of this assertion, Defendants cite FOIA Exemptions 1 and 3. Exemption 1 states that FOIA disclosure obligations do not apply to matters that are: (1) "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy;" and (2) "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption 3 states that FOIA disclosure obligations do not apply to matters that are "specifically exempted from disclosure by [another] statute" if that statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).[3] In evaluating the Defendants' *Glomar* response, I must give "substantial weight to detailed agency explanations" of national security concerns, *King*, 830 F.2d at 217. I must also keep in mind that publicly-known information generally cannot be withheld under Exemptions 1 and 3, although FOIA does not allow individuals to force official acknowledgment of matters that are "the subject of widespread media and public speculation." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983).

---

[3] Where the relevant statute was enacted after FOIA, Exemption 3 requires that the statute expressly indicate that the exemption applies. 5 U.S.C. § 552(b)(3).

7

Defendants correctly invoke Exemption 1, for information properly classified pursuant to executive order in the interest of national defense or foreign policy. Sections 1.1 and 1.4 of Executive Order 13526 authorize original classification authorities to classify information that "could reasonably be expected to cause identifiable or describable damage to the national security" and that "pertains to" one or more items on an enumerated list. 75 Fed. Reg. 707, 707, 709 (Dec. 29, 2009). Two of the items on the list are "intelligence activities (including covert action), intelligence sources or methods, or cryptology" and "foreign relations or foreign activities of the United States, including confidential sources." *Id.* at 709.

The existence or non-existence of records covered by the *Glomar* response has been classified. Hardy Decl. at ¶ 4; Lewis Decl. at ¶ 4; Mason Decl. at ¶ 6; Stein Decl. at ¶ 7. Original classification authorities at DOD, State, and Treasury have determined that the disclosure of information that would tend to confirm one way or the other any role that the United States may have played in the alleged drone strike would risk revealing the existence or nonexistence of intelligence relationships with foreign liaisons and would risk revealing information about the United States's foreign relations and foreign activities. Hardy Decl. at ¶¶ 41, 44; Lewis Decl. at ¶¶ 24, 27; Mason Decl. at ¶¶ 24, 27; Stein Decl. at ¶¶ 27, 30. They have also determined that disclosure of this information "could reasonably be expected to cause identifiable or describable damage to the national security" by jeopardizing the continued usefulness of intelligence sources, prompting countries to rethink their acquiescence to American counter-terrorism missions within their borders, weakening or even ending American relationships with foreign partners who rely on their cooperation being kept in strict confidence, and triggering political consequences for foreign liaisons who might be suspected of involvement with drone strikes. Hardy Decl. at ¶¶ 42, 45; Lewis Decl. at ¶¶ 25, 28; Mason Decl. at ¶¶ 25, 28;

Stein Decl. at ¶¶ 28, 31.[4] I find that classification has taken place and is proper under Executive Order 13526 and that the Defendants' *Glomar* response is therefore justified by Exemption 1.

Even if this were not the case, the Defendants' *Glomar* response would be justified on the alternative ground that Defendants have properly invoked Exemption 3, for information that is statutorily exempt from disclosure. The National Security Act requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).[5] As discussed above, the disclosure of information that tends to confirm one way or the other any American role in the alleged drone strike would risk revealing the existence or nonexistence of intelligence relationships with foreign liaisons and could lead to the unauthorized disclosure of intelligence sources. Accordingly, the Defendants' *Glomar* response is justified by Exemption 3 as well as by Exemption 1.

None of Plaintiffs' arguments to the contrary are persuasive. Plaintiffs argue that the Defendants' *Glomar* response is unjustified for four reasons. First, the response is unclear and overly broad. Pls.' Opp. to Defs.' Mot. Dismiss at 5-14. Second, if in fact the United States was not involved in the alleged drone strike, acknowledging that fact would have no impact on national security because it would not disclose any information about America's intelligence liaisons, foreign relations, or foreign activities. Pls.' Opp. to Defs.' Mot. Dismiss at 14-16; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 11-12. Third, acknowledging that the United States was involved in the alleged drone strike would have no impact on national security because Yemen

---

[4] OIP lacks original classification authority but relies on the determinations of the other Defendants' original classification authorities. Brinkmann at ¶¶ 7-8.

[5] Agencies other than the National Security Agency are permitted to invoke this provision as grounds for withholding information under Exemption 3. *See Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (accepting CIA invocation of the National Security Act).

has already disclosed this involvement. Pls.' Opp. to Defs.' Mot. Dismiss at 16-17; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 12-14. Fourth, the Defendants' affidavits stating that the information covered by the *Glomar* response is classified are untrue. Pls.' Opp. to Defs.' Mot. Dismiss at 17-19; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 12 n.3.

Plaintiffs' overbreadth argument criticizes the Defendants for failing to show that any of the categories of requested information consists entirely of information covered by the *Glomar* response, arguing that this shows the Defendants have been "less than forthcoming and candid . . . about the actual scope of their *Glomar* responses." Pls.' Opp. to Defs.' Mot. Dismiss at 14. However, the Defendants have never alleged that any category of requested information is entirely covered by the *Glomar* response. They have candidly acknowledged that the categories of information Plaintiffs requested are too broad and ambiguous to identify each request as entirely within or entirely beyond the scope of the *Glomar* response. Defs.' Reply ISO Mot. Dismiss at 3. This is why, in addition to invoking *Glomar*, Defendants have searched for and produced information not covered by the *Glomar* response. This is appropriate and does not show a failure to be forthcoming.[6]

Plaintiffs' argument that the *Glomar* response is unjustified because the United States could safely acknowledge the truth if it were not involved in the alleged drone strike fares no better. In support of their view that a *Glomar* response is appropriate only when harm would result from confirming a fact *and* from denying it, Plaintiffs cite a district court opinion noting that an agency described both types of harm. *See Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d

---

[6] To the extent Plaintiffs may be arguing that a *Glomar* response must identify each specific category of requested information as entirely within or entirely beyond its scope, they have failed to cite any authority in support of their view. Such a rule would allow any FOIA requester to prevent an agency from invoking *Glomar* simply by writing its requests broadly.

10

262, 269 (D.D.C. 2011). But the fact that an agency described harms that would follow both from confirming and from denying a fact does not prove that it was required to do so. Thus, Plaintiffs' proposed rule is not supported by the authority on which they rely. Moreover, Plaintiffs' proposed rule would require disclosure of FOIA-exempt material in at least some cases: In any case in which requested information exists, the existence of the information is classified, and no harm would be caused by stating that the information does not exist, Plaintiffs' rule would require the Government to disclose the classified fact that the information exists—even though FOIA does not require this. Plaintiff's proposed rule would be comparable to restricting a defendant's Fifth Amendment rights only to accusations for which he is guilty. *Cf. Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (per curiam) ("[T]ruthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth."). Neither the Fifth Amendment nor the FOIA provides such paltry protections to the interests at stake. Accordingly, I decline to adopt the Plaintiffs' proposed rule.

Plaintiffs' argument that the United States can officially confirm its alleged involvement because Yemen has already disclosed this involvement is similarly misguided. It relies on a news article alleging that the Government of Yemen provided money to family members of Salem and Waleed bin Ali Jaber and asked them to sign receipts stating that the money was paid because of deaths that took place "during an American airstrike." Pls.' Opp. to Mot. Dismiss at 17. However, a news article's allegation that a foreign government claimed that the U.S. government was responsible for a drone strike falls well short of creating a genuine dispute of material fact as to whether an official and public acknowledgment by the United States that it was involved in the drone strike could harm national security. *See Afshar*, 702 F.2d at 1130-31

(explaining that official acknowledgment of a fact is distinct from widespread speculation as to that fact and has different effects on foreign relations).

Finally, Plaintiffs' argument that the information covered by the *Glomar* response is not actually classified fails to create a genuine issue of material fact. Plaintiffs' argument that the Defendants affidavits about classification are untrue has several facets. First, Plaintiffs note that the affidavits do not state the classification level of the classified information. Pls.' Opp. to Mot. Dismiss at 17-18. Second, Plaintiffs argue that it cannot be true that more than one original classification authority determined that the information covered by the *Glomar* response was classified. *Id.* at 18; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 12 n.3. Third, Plaintiffs argue that Treasury's determination was not independent because of its representation that it originally saw no need to make a *Glomar* response but later decided that it had "no option other than asserting the *Glomar* response, consistent with the other defendant agencies." Pls.' Opp. to Mot. Dismiss at 18. Fourth, Plaintiffs argue that it was not appropriate for OIP to rely on the evaluations of original classification authorities at other agencies. *Id.* at 18-19; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 12 n.3.[7] Whether taken individually or together, these concerns are insufficient to create a genuine issue of fact as to the classification of the information covered by

---

[7] Plaintiffs also express skepticism about the classification of the information covered by the *Glomar* response because the supporting affidavits use a significant amount of identical language and because one affidavit includes two instances of the placeholder "[agency]" where the name of the specific agency in question should have appeared. Pls.' Opp. to Mot. Dismiss at 6 n.3; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 12 n.3. Plaintiffs correctly note that this suggests the Defendants' lawyer drafted language for use in the Defendants' affidavits. However, this is not an indication that the assertions in the affidavits were made without personal knowledge or in bad faith as the Plaintiffs argue. It is common practice for an attorney to draft an affidavit for a client, and the client who signs the affidavit vouches for its truth as surely as if he had drafted it himself.

the *Glomar* response.[8] Even if they created a genuine issue of fact, it would not be material because, as explained above, the information in question would fall under Exemption 3 even if it information were not classified.

Accordingly, I find that the Defendants' *Glomar* response was appropriate. FOIA Exemptions 1 and 3 allow the Defendants to decline to confirm or deny the existence of any records that would tend to confirm one way or the other any role the United States played in the alleged drone strike. This information has been properly classified pursuant to Executive Order 13526 and is statutorily protected by 50 U.S.C. § 3024(i)(1).

### B. The Searches Were Reasonable

As explained above, an agency can demonstrate the reasonableness of its search through a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. Such statements enjoy "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. Inc.* v. *SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

---

[8] As to the first concern, one need not state a classification level in order to say truly that information is classified. As to the second, Plaintiffs' argument appears to conflate the Defendants' actual representation that multiple original classification authorities determined that certain information was classified with the untenable representation that each of those authorities was the first to classify that information. As to the third, Plaintiffs depend on selective quotation to obscure the fact that Treasury changed its position on whether it needed to invoke *Glomar* because it changed its understanding of whether it could possess records the existence of which would tend to confirm one way or the other whether the United States played a role in the drone strike. Mason Decl. at ¶ 5; *see also* Defs.' Reply ISO Mot. Dismiss at 8. As to the Plaintiffs' fourth concern, it is not supported by authority and fails to recognize that a *Glomar* response can be justified in the interest of protecting properly classified information regardless of how the agency determines that the information is classified.

DOD has submitted an affidavit detailing how it searched for responsive records not subject to the *Glomar* response. It states that DOD identified five offices reasonably likely to possess responsive records. Lewis Decl. at ¶ 36. It explains that OSD Public Affairs conducted electronic searches of users' classified and unclassified email accounts, home drives, and shared drives for records containing the terms "drone strike," "Yemen," and either the name of one of the alleged victims or the name of Plaintiff Faisal bin Ali Jaber; OSD Legislative Affairs used the same names to search classified and unclassified systems for relevant emails, paper files, or electronic files; CENTCOM searched physical folders, email accounts, public and private electronic folders, SharePoint webpages and portals, and drives on computer systems of all classification levels using various combinations of search terms listed in the affidavit; the Air Force Office of the Judge Advocate searched paper files and classified and unclassified electronic records for nineteen variants of the name Ali Jaber; and the OSD Office of the General Counsel searched the entire electronic and paper case files of the attorney who represented DOD in related litigation. *Id.* at ¶ 37-41. The affidavit avers that DOD "has conducted searches of all offices reasonably likely to possess records responsive to certain portions of Plaintiffs' requests that do not implicate the *Glomar* response, and released the reasonably segregable portions thereof." *Id.* at ¶ 51. DOD produced 1,072 pages of documents and withheld 125 pages under Exemption 5, the deliberative process and attorney-client privileges, and the attorney work product doctrine. *Id.* at ¶¶ 37, 41.[9]

---

[9] Plaintiffs' argument that DOD has not conducted an adequate search relies on a portion of its affidavit that describes how DOD's preliminary searches were incomplete. Pls.' Opp. to Defs.' Mot. Dismiss at 20 (citing Lewis Decl. at ¶ 34). In light of DOD's additional searches for all responsive material not covered by the *Glomar* response, this argument is unpersuasive.

State has submitted a similar affidavit. It explains that State identified five offices or records systems as being reasonably likely to possess responsive records. Stein Decl. at ¶ 37. It describes the terms used to search the Central Foreign Policy Records, which is State's centralized records system; the Consular Consolidated Database, which holds all data entered by consular officers from American embassies and consulates around the world; the electronic records, office shared drive, and email collective of the Bureau of European and Eurasian Affairs; the email for the Desk Officer for Germany; the office shared drive and cable archives of the Bureau of Near Eastern Affairs; and various files and email accounts maintained by the Office of the Legal Adviser's Office of Political-Military Affairs. *Id.* at 39-52. It also describes records searches at various embassies and consulates that were conducted at Plaintiffs' request. *Id.* at ¶ 37, 53-59. The affidavit avers that State "conducted a thorough search of State records systems that it deemed reasonably likely to maintain records responsive to Plaintiffs' FOIA request." *Id.* at ¶ 86. State identified 43 responsive records, 23 of which were released in full, 18 of which were released in part, and 2 of which were withheld under FOIA exemptions. *Id.*[10]

DOJ submitted separate affidavits describing the searches conducted by the OIP and FBI. The OIP's affidavit states that OIP initiated searches within the Offices of the Attorney General

---

[10] Plaintiffs argue that State's search was inadequate because State produced an email from a Mr. Fabry referencing an email sent by Ms. Brown through State's classified email system but did not: (1) produce Ms. Brown's email; (2) expressly state that it searched for Ms. Brown's email; (3) expressly state that Mr. Fabry's classified email account was included in the search; or (4) explain why a search of other email accounts would reasonably be expected to identify Ms. Brown's email. Pls.' Opp. to Defs.' Mot. Dismiss at 20-21; Pls.' Sur-Reply to Defs.' Mot. Dismiss at 15. State is not required to provide a separate accounting of its efforts to identify every document that is referenced in its productions but not itself produced. *See Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("It is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate.").

15

and Deputy Attorney General, which identified seven official who might have responsive email records; that the email accounts of these officials, together with the official records repository for both offices, were searched for records containing the variants of Faisal bin Ali Jaber's name; and that "these searches were reasonably calculated to uncover all potentially responsive records." Brinkmann Decl. at ¶ 13-22. The FBI's affidavit states that its Central Records System is the only record system where responsive records would likely be maintained and that it searched the CRS using a three-way phonetic breakdown of Faisal bin Ali Jaber's name, using all the name variants provided in his request letter. Hardy Decl. at ¶ 21-23. DOJ produced 107 pages of responsive records in part and withheld 33 pages in full pursuant to Exemption 5. Brinkmann Decl. at ¶ 23; Hardy Decl. at ¶ 49.

Treasury's affidavit states that Treasury identified "personnel within OIA covering relevant regional areas, and one attorney within the Office of General Counsel," as individuals reasonably likely to possess any relevant records. Mason Decl. at ¶ 33. It explains that these personnel searched classified and unclassified email accounts and electronic holdings for records that used a variant of the name "Jabir" and either the phrase "drone strike" or the word "Yemen." *Id.* at ¶ 34. It avers that "the Department has conducted searches of all offices reasonably likely to possess records responsive to certain portions of Plaintiffs' requests that do not implicate the *Glomar* response." *Id.* at ¶ 35. Treasury did not identify any responsive records outside the scope of the *Glomar* response. *Id.* at ¶ 34.[11]

---

[11] Plaintiffs' argument that Treasury has not conducted an adequate search is based on a portion of Treasury's affidavit describing its original search. Pls.' Opp. to Defs.' Mot. Dismiss at 20 (citing Mason Decl. at ¶ 5). In light of Treasury's additional searches for all responsive material not covered by the *Glomar* response, this argument is unpersuasive. Plaintiffs also argue that there is an irreconcilable contradiction between the statement in Treasury's Reply Brief that "Treasury mistakenly believed that it initially conducted an adequate search for responsive records, the existence or non-existence of which would not tend to reveal classified or

16

Defendants' affidavits demonstrate that they conducted reasonable searches for information not implicated by their *Glomar* response. However, Plaintiffs make the belated argument in their Sur-Reply that Defendants should have conducted reasonable searches for all responsive records, including records implicated by the *Glomar* response. Pls.' Sur-Reply to Defs.' Mot. Dismiss at 2-9. Plaintiffs have not made any suggestions as to how a reasonable search for all responsive records would differ from the searches that were conducted, nor is it apparent to me that the Defendants' searches were inadequate even if Plaintiffs interpretation of the law were correct.

In any event, Plaintiffs have not cited any authority squarely supporting their view that an agency can only make a partial *Glomar* response after searching for all responsive records and proving that the records covered by the *Glomar* response fall within a FOIA exemption. *See id.* at 8 (stating that this case presents a novel fact-pattern not covered by the cases discussed). In fact, the United States Court of Appeals for the District of Columbia explained that it has never even implied that a search and segregability analysis is necessary before making a partial *Glomar* response. *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 934 (D.C. Cir. 2012).[12] I decline to

---

statutorily-protected information" and the statement in Treasury's affidavit that "Treasury did not originally believe that it needed to assert a *Glomar* response because it mistakenly believed that no offices within the Department would possess records responsive to any of the categories of document sought by Plaintiffs in their FOIA request." Pls.' Sur-Reply to Defs.' Mot. Dismiss at 14-15. However, these statements are reconcilable. The first statement alleges that Treasury believed that confirming the existence or non-existence of responsive records would not tend to reveal classified or statutorily protected information. The second statement provides the reason: Treasury believed that it would not have responsive records regardless of whether the United States was involved in the alleged drone strike. *See* Defs.' Reply at 8.

[12] Plaintiffs' argument relies on *Jefferson v. Department of Justice*, 284 F.3d 172 (D.C. Cir. 2002), which held that an agency had failed to adequately support its partial *Glomar* response. Pls.' Sur-Reply to Defs.' Mot. Dismiss at 6. However, the problem in *Jefferson* was not that the agency made a partial *Glomar* response without first identifying all the documents that would be included in its scope. The problem was that the agency asserted that all records related to its

17

adopt the novel rule that Plaintiffs suggest. Instead, I find that the Defendants' search was adequate.

## IV. CONCLUSION

For the reasons explained above, I conclude that the Defendants' *Glomar* response was appropriate and that the searches they conducted were adequate. Accordingly, the Defendants' motion for summary judgment will be granted and the Plaintiffs' partial motion for summary judgment will be denied. A separate order will issue.

Dated: February 1, 2018

TREVOR N. MCFADDEN
United States District Judge

---

investigations were law enforcement records even though applicable regulations authorized the agency to maintain records of investigations that had no law enforcement purpose. *Jefferson*, 284 F.3d at 178-79; *see also Elec. Privacy Info. Ctr.*, 678 F.3d at 934-35 (distinguishing *Jefferson* on these grounds).